IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | REPORT AND RECOMMENDATION |
| v. | 07-CR-091-C |
| JOHN HIGH, | |
| Defendant. | |

_____

**REPORT**

The grand jury has charged defendant John High as a felon in possession of a .22 revolver and bullets. High has moved to suppress the firearm and ammunition charged against him, which police recovered during execution of a state search warrant. High argues that it was unreasonable for the police to enter and secure his apartment (in which he was living with his grandmother) prior to preparing their warrant application or obtaining a warrant. The government disagrees. As discussed below, this case has messy facts that present a jumble of equities. The bottom line is that the police did not act unreasonably toward High; therefore, he is not entitled to relief under the exclusionary rule.

On September 24, 2007, this court held an evidentiary hearing on High's motion. Having heard and seen the witnesses testify, having made credibility determinations, and having considered all of the exhibits, documents and affidavits, I find the following facts:

**FACTS**

On October 14, 2003, Greg Bray was shot dead in a duplex on Raymond Road in Madison. Police Detective Tim Hammond eventually became the lead investigator; Detective Tom Woodmansee assisted in this investigation. The police knew that a safe had been taken

from Bray's residence during the murder but they kept this fact secret so that they could use it later to test the credibility and reliability of informants claiming to have knowledge of the crime. The police were unable to develop a suspect in Bray's murder, so the case went cold.

Fast-forward 3½ years to Friday, April 27, 2007: Detective Hammond received a voice mail message from a "Crime Stoppers" officer reporting that an unidentified woman had called the Crime Stoppers hotline to report that a man named John High had been involved in a homicide on the west side of Madison and that he still had the handgun at his grandmother's apartment. From the nature of this report, Detective Hammond surmised the informant was talking about Bray's murder. That same day Detective Hammond learned that a Dane County Crime Victims Witness Program Officer, Julie Foley, had received similar information from a woman serving a term of deferred prosecution. Detective Hammond asked Foley to persuade this woman to talk directly to the police; Foley responded that she was trying. The following Monday, April 30, Detective Hammond began researching the alleged shooter, John High. Detective Hammond learned that High had an extensive criminal history including drug and weapon charges, and that High had not been in custody on October 14, 2003. According to probation records, High currently was living with his grandmother, Mary Donahue, in her apartment at 6809 Schroeder Road, #3, in Madison. (High occasionally stayed with his wife, Shameco Ross-High, at her apartment on King James Way in Fitchburg. Theirs was a tempestuous relationship).

On Tuesday, May 1, 2007, an unidentified woman (soon determined to be Angela Sims) drove to Madison's west district police station and asked to speak to someone regarding a

murder. Detective Woodmansee met with her in an interview room. Sims declined to provide her name, stating that she feared for her safety. Sims announced that she was troubled and burdened by recently-received information about a murder. She had met with her pastor and had spoken with someone in the deferred prosecution program (that is, Julie Foley, who already had spoken with Detective Hammond but had withheld Sims's name). Sims ultimately decided that she had to talk to the police so that she could get this matter off of her chest.

     Sims reported that she had a tight but tumultuous friendship with a woman named Shameco Ross-High. Several nights earlier Ross-High and Sims had been drinking and dishing. Their get-together was interrupted when High, a male friend named Cutter and an unknown female let themselves into Ross-High's apartment and made themselves at home. Cutter so offended Sims with sexual suggestions that Sims left. She returned later that night after the trio had departed. Ross-High was extremely upset with High for having come into Ross-High's home with another woman. Sims reported that Ross-High, who had appeared to be drunk, told Sims that she should call the police to tell them about the murder High had committed in which he shot someone in a duplex on Raymond Road, removed a safe and spent the money on a car.

     As this narrative began, Detective Woodmansee had no idea about which incident Sims might be speaking. As she added details, he realized that she was talking about the Bray murder, which had occurred in a duplex on Raymond Road and from which a safe had been taken, a fact that Detective Woodmansee knew had not been released to the public at any time. The woman was very frightened, expressing grave concern for her safety if Ross-High or High discovered she had talked to the police. She was, however, very deliberate and very detailed in her explanation,

leading Detective Woodmansee to conclude that she was providing credible, material information that the police needed to take seriously. To insure that he would be able to follow up with this witness in the future, Detective Woodmansee quietly directed an officer to visit the parking lot, copy the license plate number from Sims's car, and run the plate. From this the police learned Sims's identity.

Oblivious to this subterfuge, Sims continued her narrative, reporting that Ross-High had confided during their conversation that the gun her husband had used to shoot Bray remained hidden at High's grandmother's residence on Schroeder Road. Detective Woodmansee interrupted to observe that it would be unusual for a shooter to keep the murder weapon around this long. Sims replied that this was what Ross-High had told her, and that the weapon still was at the grandmother's house.

At Detective Woodmansee's request, Sims provided a physical description of John High. Detective Woodmansee checked police records to confirm that High existed and that he matched the physical description provided by Sims. Detective Woodmansee retrieved booking photos of High and Sims confirmed that he was Ross-High's husband. Detective Woodmansee telephoned Detective Hammond (who worked at the East District), unaware that Detective Hammond had received similar information the previous Friday. Detective Hammond confirmed to Detective Woodmansee that Sims's information was accurate and that her information about the missing safe never had been made public.

By this point, Sims had been talking to Detective Woodmansee for about an hour. Detective Woodmansee asked Sims to telephone Ross-High from the police station to see if she

<a>
</a>

could get her talking about the murder. Sims resisted, but Detective Woodmansee persuaded her that this was important.

Sims reached Ross-High on the telephone at Ross-High's apartment on King James Way, (about four miles from the West District station). Their conversation was prickly and agitated due in part to a recent, unrelated spat. Sims obliquely broached the topic of their previous conversation by asking if Ross-High was safe from her husband in light of Ross-High's statement to Sims that Ross-High was going to "call the police." Neither one of the women mentioned a murder or a gun. As it turns out, High was with Ross-High at her apartment when she took Sims's call. He can be heard talking to Ross-High in the background and he obviously could hear everything that Ross-High said. *Listen to* Gov. Exh. 1 (CD recording of the conversation). Once Detective Woodmansee realized that John High was present with Ross-High, he knew that he would not get any worthwhile admissions out of Ross-High during this telephone conversation.

Not surprisingly under the circumstances, Ross-High voiced resentment at Sims's implication that Ross-High was not safe from her husband, sharply and repeatedly demanding why Sims would ask a question like that. Ross-High acknowledged that she and Sims had had the conversation to which Sims was referring but characterized her own statements as "drunk shit . . . bullshit." {* * *} "That was none of that true!" *Id.* Ross-High counterattacked by accusing Sims of cocaine use ("tube blow"), which Sims denied.[1] The women revisited their

---

[1] Sims admitted to Detective Woodmansee that she had been a cocaine user in the past but was clean now. Detective Woodmansee saw no signs that Sims was under the influence of alcohol, cocaine or any other substance at the time of their meeting, despite her agitation.

more recent spat and yelled at each other.  Both women clearly were very agitated by the time the call ended.  Detective Woodmansee and Sims agreed that the call had not gone well.

In fact, things had gone so poorly that Sims feared that Ross-High and High now suspected that Sims was cooperating with the police.  In light of Sims's concern, Woodmansee suggested that she go home.  About 30 minutes after the phone call ended, Detective Woodmansee walked Sims to her car, thanked her for her cooperation and obtained her telephone number.

Detective Woodmansee returned to his desk to contact other police about this apparent break in the Bray homicide investigation.  Within two or three minutes, Sims called Detective Woodmansee in a panic, claiming that a white car was tailing her and bumping her vehicle; she believed it was John High.  Alarmed, Detective Woodmansee immediately scrambled patrol officers for an emergency response to Sims's location.  Sims remained on the telephone; Detective Woodmansee urged her to return to the police station so that he could communicate more effectively with her.

Sims returned to the parking lot and Detective Woodmansee ran outside to meet her. Sims was extremely frightened and visibly agitated.  The patrol officers returned and reported that they were unable to confirm Sims's report of a collision.  Based on Sims's followup information, the officers returned to the field to attempt verification; they were unable to confirm her report.  The officers noted a small dent in Sims's car but nothing else.  Even so, Detective Woodmansee could not rule out the possibility that High had driven from Ross-High's apartment on King James Way to see if Sims was at the police station.  At some point after she

calmed down, Sims conceded that she wasn't sure whether High had been involved in this incident.

Detective Woodmansee re-contacted Detective Hammond to discuss their investigative strategy. They agreed that as a result of Sims's phone call to Ross-High, High might realize that the police now were on to him as a suspect in the Bray homicide. They decided that they had to react immediately to prevent High from disposing of the murder weapon if he actually still possessed it. The detectives agreed that they had to secure High's grandmother's apartment on Schroeder Road. At the detectives' direction, at about 10:45 a.m. officers drove to this apartment, announced their purpose to High's grandmother (Mary Donahue) conducted a protective sweep of the apartment, then ensconced themselves in the living room awaiting further instructions from the detectives. Police found High at Ross-High's apartment and took him to the west side station for questioning. It is not clear if High was under arrest or went with the police voluntarily, but the bottom line is that he had not been present at the Schroeder Road apartment and did not ask or attempt to return.

Rather than apply for a search warrant based on the information they already possessed, the detectives began interviewing everyone available who might have knowledge relevant to the murder investigation. They re-interviewed Sims at about 1:00 p.m. Although Sims stuck with her story, she added flourishes that had not been part of her original account (for instance, by magnifying the boorishness of Cutter's conduct). Ross-High, questioned at the police station, confirmed every aspect of Sims's report of their get-together the previous week *except* that she denied having spoken about or having any knowledge about her husband's involvement in the

Bray murder. High's grandmother, Mary Donahue, also denied any knowledge of her grandson's alleged involvement in the Bray murder. Donahue further denied knowledge of any guns in her apartment. Police interviewed Ross-High's sister, Toranda Ross, who similarly denied any knowledge or information about the Bray murder or guns in the apartment.

The detectives continued their interviews all afternoon. Apparently Donahue remained in her apartment with officers present. At about 4:30 p.m. that afternoon, Donahue prepared to leave for a doctor's appointment. On her way out the door, she told the officers that they would find bullets on her dresser in a brown box and would find a gun in one of the bedroom closets. Not long after, two of Donahue's daughters advised the police that there were firearms in the apartment that had belonged to their now-deceased father (High's grandfather).

The detectives added these admissions into the mix; it was around 5:00 p.m. before they actually began drafting their painfully detailed search warrant application, which they presented to the court later that same evening. The court issued the search warrant. At about 10:45 p.m. that same evening, officers found and seized the handgun and bullets charged against High as a federal § 922(g) violation.

**ANALYSIS**

High's motion to suppress presents the evidentiary equivalent of a Möbius strip: because the statements about guns by High's grandmother and aunts occurred after the initial warrantless entry into the apartment, the suppression analysis perforce circles back to the reasonableness of that entry without reference to these admissions. Thus, the question before

8

the court is whether it was constitutionally reasonable for the police to enter the apartment based on what they knew then, coupled with the related question whether the stay became unreasonable based on how long it lasted and what the police learned during that time. The analytical starting point is the Supreme Court's holding in *Segura v. United States*, 468 U.S. 796 (1984):

> Securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents.

*Id.* at 810.

This is because defendants and their associates are not entitled to destroy evidence while police wait for a search warrant. *Id.* at 816; *see also Illinois v. McArthur,* 531 U.S. 326, 331-33 (2001)(where police had probable cause to believe suspect had marijuana in his trailer home and would destroy it if they let him enter unmonitored, it was constitutionally reasonable for police to forbid him to enter his own residence without a police escort for two hours while they obtained a search warrant); *see also United States v. Blackwell*, 416 F.3d 631, 633 (7th Cir. 2005).[2]

I conclude that the police had probable cause to enter the apartment. Probable cause to support a search exists if the police possess evidence sufficient to induce a reasonably prudent person to believe that the search will uncover evidence of a crime. The inquiry is practical, not technical. *United States v. Watzman*, 486 F.3d 1004, 1007 (7th Cir. 2007)(a

---

[2] To digress briefly, I note that it is appropriate to consider whether a third-party witness's testimony derives from a violation of the defendant's Fourth Amendment rights. *See United States v. Ceccolini*, 435 U.S. 268, 275-75 (1978); *United States v. Ienco*, 182 F.3d 517, 529-30 (7th Cir. 1999). Therefore, there is no "shortcut" available in the legal analysis.

search warrant case); *see also United States v. Ellis*, 499 F.3d 686,689 (7th Cir. 2007)(probable cause is a fluid concept based on common sense interpretations of reasonable police officers as to the totality of the circumstances known to them at the time). As the Court noted in *Brinegar v. United States*, 338 U.S. 160 (1949),

> In dealing with probable cause, . . . as the very name implies, we are dealing with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.

*Id.* at 175.

This is a low evidentiary threshold, requiring only a probability or a substantial chance of criminal activity, not an actual showing of such activity. *United States v. Roth*, 201 F.3d 888, 893 (7th Cir. 2000) (*quoting Illinois v. Gates*, 462 U.S. 213, 244 (1983)). In this case, given the later-collected conflicting reports from the witnesses related to High, it is important to note that a probable cause determination does not require the resolution of conflicting evidence that the preponderance of evidence standard requires. *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003). "All that is required for a lawful search is *probable* cause to believe that the search will turn up evidence or fruits of crime, not certainty that it will." *United States v. Ramirez*, 112 F.3d 849, 851-52 (7th Cir. 1997)(emphasis in original). Although people often use "probable" to mean "more likely than not," probable cause does not require a showing that an event is more than 50% likely. *See United States v. Garcia,* 179 F.3d 265, 269 (5th Cir. 1999); *see also United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003) (probable cause determination does not require resolution of conflicting evidence that

preponderance of evidence standard requires); *Edmond v. Goldsmith*, 183 F.3d 659, 669 (7th Cir. 1999) (Easterbrook, J., dissenting) (probable cause exists somewhere below the 50% threshold).

In challenging probable cause, High attacks Sims's credibility by equating her with an untested informant. Actually, Sims is closer much closer to a citizen witness, whose reliability is less suspect:

> When police officers obtain information from an eyewitness or victim establishing the elements of a crime, the information is almost always sufficient to provide probable cause for an arrest in the absence of evidence that the information, or the person providing it, is not credible. When probable cause has been gained from a reasonably credible victim or eyewitness, there is no constitutional duty to investigate further.
>
> *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 524 (7th Cir. 2001)(a § 1983 civil lawsuit for false arrest*)*.

Informants, on the other hand, are presumptively subject to skepticism. *See, e.g., United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003) (untested informant with an admitted grudge against defendant did not provide enough specific details about defendant or his alleged drug dealing to establish probable cause); *United States v. Koerth*, 312 F.3d 862 (7th Cir. 2002)(no probable cause from conclusory statements by untested informant who presents no indicia of reliability; however, good faith doctrine rescues the warrant).

So which is Sims? She is not an anonymous telephonic informant with an inscrutable personal agenda, nor is she a paradigmatic street informant unwillingly working off a beef. Detective Woodmansee found her to be a credible citizen conflicted by friendship but motivated

11

by her desire to do the right thing.  High tries to impeach Sims's motives by insinuating that she was trying to punish Ross-High because of their spat, but this was not Detective Woodmansee's impression at the time and on these facts it is an illogical premise.  Sims's report of what Ross-High told her and why Ross-High said it was much too intricate and indirect to qualify as a fabrication intended to get even with Ross-High.  As circuitous as Sims's tale may have been, it was internally consistent and logical: a jealous wife, humiliated by her footloose husband in front of others, lashes out to salve her pride and punish his transgression.[3]

The fact that Sims was willing to follow-up with Ross-High in a recorded telephone call further demonstrates that Sims was willing to put her money where her mouth was.  Next, the volatility of the Sims/Ross-High relationship comes through loud and clear during the phone call; it militates against the argument that their current disagreement was so severe as to cause Sims to frame Ross-High's husband.  Additionally, their recorded telephone conversation leaves the clear impression that Ross-High actually *said* the things Sims reported to the police but is trying to erase them from the slate as drunk talk.  Maybe it was, but this doesn't necessarily reduce the reliability of these statements in determining probable cause that High was keeping a handgun at his grandmother's apartment.  "*In vino veritas*" may be a hoary bromide, but it became one because human experience proves it often to be true.

---

[3]  "Heaven has no rage like love to hatred turned
    "Nor hell a fury like a woman scorned"

    — William Congreve, "The Mourning Bride."

12

Which brings us to the safe. Try as he might, High cannot get past Sims's knowledge that a safe was taken from Bray's duplex. High's conjecture that Sims may have learned this fact from someone working for the district attorney or the deferred prosecution unit is desperate speculation with no support in the record or in common sense. No one outside the law enforcement community knew about the safe except those with knowledge of Bray's murder, and there isn't even a whisper in the record that they would have shared or did share this information with Sims.

Therefore, even if this court were to downgrade Sims from citizen witness status to untested informant status, her knowledge of the safe generates instant credibility. Once the police corroborate material fact reported by an informant but not readily knowable to the general public, the informant's tip assumes a high degree of reliability. *Illinois v. Gates*, 462 U.S. 213, 244 (1983). Police corroboration sufficiently reduces the chance that the informant is telling a reckless or prevaricating tale. *Id.; see also United States v. Brown*, 366 F.3d 456, 460 (7th Cir. 2004). On the other hand, High notes that Sims never saw the gun or the safe, did not hear the admissions from High himself, and never appeared in front of the state court judge for a credibility determination, all of which are circumstances relevant to the probable cause determination. *See United States v. Koerth*, 312 F.3d at 866. But no one factor is dispositive, and in this case, Sims's knowledge of a highly material and closely-held fact was the 72-yard touchdown strike in overtime. The facts known to the police on May 1, 2007 established probable cause to believe that they would find the Bray murder weapon at the apartment High shared with his grandmother.

The next question is whether the police could justify their warrantless seizure of this apartment with a "plausible claim of specially pressing or urgent law enforcement need, *i.e.*, 'exigent circumstances.'" *McArthur*, 531 U.S. at 331; *see also Minnesota v. Olson*, 495 U.S. 91, 100-01 (1990) (warrantless intrusion may be justified by imminent destruction of evidence). High expresses legitimate skepticism toward Sims's post-interview report of an automobile attack. It's just as likely that the emotionally distraught Sims, steeped to her eyeballs in fear, guilt and paranoia, misinterpreted some unrelated incidence of road rage. But it was not impossible for High to have driven from King James Way to the police station following Sims's phone call with Ross-High. And Detective Woodmansee knew, after listening to that debacle of a recorded conversation, that Ross-High was angry at and suspicious of Sims for broaching the topic, and he knew that High was there with Ross-High.

It was at least plausible that High might have engaged in self-help by driving to the west side station to see if Sims was there. It was much more likely that High now knew that Ross-High had spilled the beans to Sims about the Bray murder, so that High had to get back to his own apartment to ditch the handgun before the police came looking for it. In a sense, the police created the exigency by having Sims call Ross-High, but they certainly did not intend to do so; Detective Woodmansee obviously had a different outcome in mind when he persuaded Sims to make this call. Having had his decision blow up in his face, Detective Woodmansee was not required to acquiesce to the equivalent of an assessed penalty stroke by allowing High an opportunity to deep-six the handgun. Therefore, on the facts known to them that morning, it

was reasonable for the police to enter the apartment and secure it pending their obtaining a warrant.

High argues that this was not the least obtrusive manner of securing the apartment, but there really were no alternatives that actually were less obtrusive. True, it was unlikely that anyone actually could destroy a handgun inside the apartment if the police waited outside, but what were the police supposed to do if anyone present in the apartment attempted to leave? They would have to perform a weapons pat-down that could be viewed by the recipient as more invasive than having a police officer sitting in the living room. The police could have prevented anyone from entering or leaving the apartment (as in *McArthur*, 531 U.S. at 328), but by having a police presence in the apartment, Donahue and any visitors essentially were free to go about their business. So, at least initially, the restraint was tailored to the perceived need. *See McArthur*, 531 U.S. at 331.

But what happened thereafter is more troublesome. Rather than immediately begin drafting their warrant application, the detectives undertook almost six hours of interviews, trying to generate more probable cause. On the one hand this could be viewed as commendable, since the police wanted to ensure that they had an air-tight application before they applied to the court. *See McArthur*, 531 U.S. at 332 ("they left his home and his belongings intact until a neutral magistrate, finding probable cause, issued a warrant.") On the other hand, the police must make reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy, including limiting the time of the intrusion as much as possible. *Id.* The point on the time line separating reasonable from unreasonable depends on the circumstances. The two hour lock down of the defendant's residence in *McArthur* was deemed reasonable; so was the

15

19 hour, overnight encampment of the police in *Segura*, where the delay apparently was cause in part by the administrative decision to book and process the arrestees before drafting a search warrant affidavit. *See* 468 U.S. at 812. The Court's concerns about this long delay were assuaged in part because there was "no evidence that the agents in any way exploited their presence in the apartment; they simply awaited issuance of the warrant." *Id.*

Essentially, that's what happened here. There is no evidence that the officers waiting in the apartment snooped about looking for evidence. High, at least, was not present. If anyone had a right to be irritated, it was Donahue, but her irritation at this five- to six-hour intrusion is not a basis to suppress evidence in High's prosecution. Further, in light of my conclusion that the police had probable cause to search before they interviewed anyone else–and that this probable cause did not evaporate in the face of the denials offered by High and Ross-High–it would be immaterial to the Fourth Amendment analysis whether Donahue made her firearm announcement as a result of the persistent and annoying police presence in her apartment.

So although it would have been preferable for the detectives to have sought their warrant forthwith, it is obvious that they chose to investigate further in good faith, and that they obtained no material advantage from delaying. Therefore, High suffered no violation of his Fourth Amendment rights that would entitle him to suppression of the evidence seized later during execution of the search warrant.

16

## RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B) and for the reasons stated above, I recommend that this court deny defendant John High's motion to suppress evidence.

Entered this 2nd day of November, 2007.

BY THE COURT:
/s/
STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

November 2, 2007

Rita Rumbelow
Assistant United States Attorney
P.O. Box 1585
Madison, WI 53703-1585

Richard Coad
Federal Defender Service
222 W. Washington, Suite 300
Madison, WI 53703

     Re: United States v. John High
         Case No. 07-CR-0091-C

Dear Counsel:

     The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

     The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

     In accordance with the provisions set forth in the newly-updated memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before November 13, 2007, by filing a memorandum with the court with a copy to opposing counsel.

     If no memorandum is received by November 13, 2007, the court will proceed to consider the magistrate judge's Report and Recommendation.

                                        Sincerely,

        /s/ S. Vogel for

        Connie A. Korth
        Secretary to Magistrate Judge Crocker

Enclosures
cc:     Honorable Barbara B. Crabb, District Judge